**IN THE UNITED STATES DISTRICT COURT FOR**
**THE EASTERN DISTRICT OF PHILADELPHIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| V. | : | CRIMINAL NO: 2:22-cr-00457-KSM |
| | : | |
| RONALD GRANVILLE | : | |

**DEFENDANT'S SENTENCING MEMORANDUM**

James A. Funt, Esq., on behalf of Defendant, Ronald Granville, respectfully submits this memorandum to assist the Court in imposing sentence that is sufficient, but not greater than necessary, to comply with the purposes of sentencing under 18 U.S.C. section 3553(a). For the reasons set forth below, a sentence of non-incarceration is appropriate in this case.

## I. NATURE OF THE OFFENSE AND GUIDELINE CALCULATION

Ronald Granville, a former Philadelphia Correctional Sergeant, who has dedicated his career to law enforcement and public service, stands before the Court having accepted responsibility for misconduct arising from his role in the offenses charged in Count One (deprivation of rights under color of law and aiding and abetting, in violation of 18 U.S.C. §§ 242 and 2) and Count Two (falsification of records and aiding and abetting, in violation of 18 U.S.C. §§ 1519). He does not minimize the gravity of these offenses. Instead, he has acknowledged his wrongdoing over five years ago, is ashamed for his role in it, and taken concrete steps toward rehabilitation.

This case is not about excusing misconduct; it is about imposing a sentence that reflects both accountability and the significant mitigating factors present. In fashioning an appropriate sentence, the Court should recognize Mr. Granville's longstanding commitment to public service,

1

his commitment to family, his limited involvement in the initial conduct, his swift acceptance of responsibility, his lack of any prior criminal history and finally his demonstrated commitment to reform. These factors all militate toward a non-incarceration sentence.

**II. OFFENSE CONDUCT**

On October 6, 2020, over five and a half years ago, Mr. Granville and several other corrections officers under his command were involved in a physical assault on an inmate at the Philadelphia Prisons. Though Mr. Granville did not initiate the assault, and his participation was far more limited than the other defendants,[1] he, nevertheless acknowledges that his conduct joining the fray, was both unwarranted and illegal. Mr. Granville then compounded that initial illegality when on October 31, 2020, his supervisor suggested - and he agreed - that they falsify records to minimize and conceal aspects of that assaultive conduct.

**III.    PROCEDURAL HISTORY AND ACCEPTANCE OF RESPONSIBILITY**

In June 2022, shortly after he was confronted by government with his participation in the misconduct two years earlier, Mr. Granville quickly admitted his role in the event and immediately indicated his willingness to accept responsibility for his conduct. He resigned from his position with the prisons, a job he had held for over a decade, and was subsequently charged on December 8, 2022[2]. One month later, on January 9, 2023, Mr. Granville appeared before this Honorable Court, waived prosecution by Indictment, and pled guilty revealing that he never intended to contest the charges, or that he wanted to exercise his constitutional right to a trial. Instead, he was always honest about his culpability and accepted responsibility in the instant matter. For several

---

[1] Video of the incident played for the Court during trial showed that Mr., Granvile did not initiate the assault, nor deliver the blows that caused the substantial injury to the victim. In fact, video evidence demonstrated that Mr. Granville's participation lasted less than 11 seconds.

[2] Due to the stain of the instant offense, despite numerous efforts to obtain employment, Mr. Granville has been unable to find work and has instead transformed himself into the primary caretaker for his young children, providing for their daily needs.

years, while Mr. Granville has waited patiently for the matter to resolve, he has remained under pre-trial supervision without incident assuming the role of primary caretaker for his two small children. Sentencing is now scheduled for April 21, 2026.

### IV.     APPLICABLE GUIDELINES

The applicable guideline is **U.S.S.G. § 2E3.1**, which provides the initial base level offense level as fourteen. Mr. Granville will additionally receive a five (5) level enhancement because of the injury sustained by the victim (even though his use of force did not cause the serious bodily injury sustained). Additionally, because, due to their occupation, the offense is deemed to have been committed under color of law, an additional six (6) level enhance enhancement will be added pursuant to USSG 2H1.1(b)(1)(B). He will also be assessed another two (2) level enhancement for obstruction of justice. With his early acceptance of responsibility, entitling him to a three-level reduction under § 3E1.1(b) the total offense level will be twenty-four, resulting in a guideline range of 51-63 months. Nevertheless, despite the guideline calculations, the defense avers that a non-incarceration sentencing option remains before the court.

### V.     MR. GRANVILLE'S PERSONAL HISTORY AND CHARACTERISTICS

Ronald Granville is a married father of three children ages 6, 11 and 14 years old. He has dedicated his entire working career to law enforcement and public service. He grew up splitting time between with his father, in Philadelphia, and his mother in Charleston, South Carolina. Both of his parents pursued careers in public service, his mother (Mary) was a probation officer, and his father (Ronald Sr.) worked as a social worker. They taught him the value of service to the community. He grew up in lower middle-class neighborhoods and though both of his parents struggled (his father with addiction issues and his mother with bouts of depression) they still

managed to provide for him and his brothers. However, their struggles often left them distracted and inattentive, which compelled Mr. Granville to seek out/rely on extended family for support.

Mr. Granville was always drawn to a career in law enforcement, and following high school graduation, landed his first job with the Charleston Sheriff's Office where he remained for ten years. Eventually he moved back to the Philadelphia area, and met his wife Fiona Granville, an intensive care neo-natal nurse at Abington Hospital. The couple has been together for 15 years and have two children, Ryker (5) and Corey (10). Mr. Granvile's third child (Ronald 3rd) lives in North Carolina with his mother but he sees him regularly.[3]

Mr. Granvile is deeply appreciative of the support his wife has provided him throughout his legal ordeal. Because he has been unable to find meaningful work with the pending charges looming, she has assumed all the financial burdens. Mr. Granville, in turn, has dedicated himself to taking care of the children as a stay-at-home dad. And while they both agreed to this plan, it has taken a significant emotional and financial toll. The strain on their marriage was further exacerbated when, in August 2022, Mr. Granville moved with his two youngest children to North Carolina to be closer to his eldest child, while his wife remained in the Philadelphia area to work and support the family. It was made worse again, over the ensuing several years, as they were forced to live in different homes until they finally found their footing in May 2025, when they moved into their current home at 408 North Sumneytown Pike in North Wales, Pennsylvania.

Mr. Granvile's caring nature extends beyond his own nuclear family. Apart from managing his family's household and all of the children's needs, he also has taken care of his mother-in-law who suffered from stage 4 cancer of her liver, colon, and the lymph nodes of her lungs. She has

---

[3] As noted in the PSR, the current custody arrangement allows him to see his son every other school break, every other Christmas and birthday, and half of the summers.

undergone surgery, as well as chemotherapy to which she did not react well. Both he and his wife help attend to her daily needs as her health deteriorates.

Mr. Granville's dedication to his family is exemplified in the letter drafted by **Kathryn Hersh** (attached hereto as Exhibit A) who met Mr. Granville seven (7) years ago (2019) when her son was in the same kindergarten class as his son Corey. She describes him as "*an outstanding father*" who volunteered to be one of the homeroom parents with her simply because he wanted to spend more time with Corey. She witnessed Mr. Granville teach "compassion and responsibility" and describes him as "very involved" with the homeroom activities like making snack bags, reading stories to the children, or leading class events. He also volunteered with the Home and School Association, volunteering his time at several different school functions which, to her, demonstrated his kind, caring, and compassionate nature, not only to his own children, but to all the kids in the class.

The stress of the instant case has destabilized the Granville home in numerous ways. Financially, they have lost their footing and have been forced to live like nomads, which subsequently disrupted their children's sense of security. This has significantly emasculated him as he lost the ability to support his family financially, which is something he had done with pride his entire adult life. Words cannot explain the devastation he feels when wondering about possible incarceration, his children's wellbeing, and the prospect of having to continually rely on his wife for financial support.

Fiona Granville has spoken with the pre-sentence investigator and describes her husband as a very genuine, loving, respectable, unbiased individual. He is, according to her, the type of man who would do anything for anybody, maintains years-long friendships, and is an amazing father. According to her, the instant conduct is completely at odds with the affectionate, calm, and

non-confrontational man she has known for the past dozen years. He is the person who breaks up fights, not engage in them.

Mrs. Granville worries about her husband's mental state because, as someone who has been working since he was 16 years old, the career he spent a lifetime building is completely gone. Compounding his heartbreak was the public humiliation when the news of his arrest broke. This indignity left him depressed and suffering with generalized anxiety disorder. But, because he is a deeply spiritual person, it also strengthened his resolve to move forward for her and the children, which is one of the reasons she loves him.

For his part, Mr. Granville acknowledges that he has had an exceedingly difficult time processing his emotions during his legal ordeal. He is less scared for himself but rather concerned how a sentence of incarceration may impact his children. And, while he is resolved to accept any punishment the Court imposes, above all, he has expressed the need to finally put this chapter of his life behind him so that he and his family can move on to the next phase of their lives.

### EMPLOYMENT HISTORY

For almost twenty (20) years, Mr. Glanville was involved in law enforcement and public service. For ten years (2004 through 2014) he served at the Charlestown County Sheriff's Office in South Carolina as a Detention Officer and then later as a Deputy Sheriff. He worked for a short time at the Montgomery County Correctional Facility in Eagleville, PA, before joining the Philadelphia Corrections Department in 2015, where he starting as a Corrections Officer. Ultimately, he achieved the rank of Correctional Lieutenant, a position he was forced to resign due to the instant case. While serving as a Deputy Sheriff in South Carolina, he was a member of the Police Honor Guard. When he served as a Corrections Officer in the Philadelphia Department of Prisons, he was a Sergeant Squad Commander. He was Lieutenant Squad Commander at CFCF,

6

where he spearheaded the Iron Clad Inmate Program[4] and also served in the Correctional Peace Officers Foundation (CPOF). Additionally, during his time in law enforcement, Mr. Granville worked a security detail with Senator Tim Scott, while he was still in Congress.

Attached to this memorandum are two letters (see Exhibit A) from former colleagues who worked with Mr. Granville while he was a Lt. at the Philadelphia Prisons. As the Court will read, Mr. Granville was highly respected and valued within the Philadelphia Prison system, maintaining an impeccable reputation as someone who always strived to serve with honor and integrity. For example, **Marvin Lane**, a now retired former Correctional Lieutenant of the Philadelphia Department of Prisons, directly supervised Mr. Granville and describes him as a *man of great integrity*, an *upstanding citizen* who was "*... one of [his] most honest and dependable staff members at the Detention Center and Curran and Fromhold Correctional Facility (CFCF)*" and as someone he could always rely on when needed. Lieutenant Lane also knew Mr. Granville outside of work and knows him to be dedicated family man who always mentioned his wife and children.

**Natalie Payne** has known Mr. Granville for nearly seven (7) years in her professional capacity at the Philadelphia Department of Prisons. Also, like Lt. Lane, it is her experience that Mr. Granville always acted professionally and strove "to do the right thing." She writes that he was highly respected and trusted not just because of his rank "but because of who he is," *someone that always talked about representing the uniform and representing Philadelphia Department of Prisons.* He was, according to her, the "consummate professional" who valued integrity and to whom "quality mattered."

---

[4] The Iron Clad Inmate Program is an inmate training opportunity to obtain vocational and industry-recognized credentials to facilitate successful workforce re-entry. The program provides training in fields like OSHA 10, electrical, and pre-CDL, focusing on job readiness.

Mr. Granville's acquired numerous skills and assumed numerous duties, while in law enforcement (both as a Sheriff and as a Corrections Officer). Those skills include field training, advanced DUI training, tactical medical training, survival training, Secret Service training (DNC Democratic National Convention detail), as well as serving in aforementioned Honor Guard. He also served as liaison to the Philadelphia Prisons, academic trainer and keynote speaker at Department of Prisons graduation ceremonies, ATF Ammunition Relations Officer, and trained City of Philadelphia employees on issues related to sexual harassment, prison operations, and anti-discrimination and diversity issues related to the LGBTQ community.

Unfortunately, regardless of his numerous skills, Mr. Granville has been unable to find employment despite significant efforts. This has placed a tremendous strain on his family, both emotionally and financially.

### **EDUCATIONAL, VOCATIONAL, AND SPECIAL SKILLS**

In addition to his longstanding employment history, Mr. Granville has extensive vocational skills that he developed over his adult lifetime. He attended Penn State University majoring in Criminal Justice earning twenty-seven (27) credits before withdrawing to support his wife and her ailing grandmother. Thereafter, he obtained his certification as a senior fitness specialist from the National Academy of Sports Medicine, has developed interests in podcasting and content creation, and has developed construction skills that have allowed him to renovate his father-in-law's home. Additionally, while awaiting sentencing in this case, in late 2023 he attended a four-week training program for a commercial driver's license certification (CDL). While he was able to secure a CDL, due to travel restrictions related to pre-trial supervision and his inability to achieve the required road time, he has been unable to find to find work in this profession.

## VI. SENTENCING CONSIDERATIONS

A sentencing court follows a two-step process, first calculating the range under the Sentencing Guidelines, and then considering that range along with all pertinent 18 U.S.C. § 3553(a) factors in determining the appropriate sentence. *See* USSG § 1B1.1 (Nov. 1, 2025)[5]. At the second step of the sentencing process, "[t]he record must demonstrate the trial court gave meaningful consideration to the ' 3553(a) factors … [A] rote statement of the ' 3553(a) factors should not suffice if at sentencing either the defendant or the prosecution properly raises 'a ground of recognized legal merit (provided it has a factual basis)' and the court fails to address it." *United States v. Cooper*, 437 F.3d 324, 329-30 (3d Cir. 2006) (citations omitted). *See also Rita v. United States*, 551 U.S. 338, 356 (2007) ("The sentencing judge should set forth enough to satisfy the appellate court that he has considered the parties' arguments and has a reasoned basis for exercising his own legal decision-making authority."); *United States v. Flores-Mejia*, 759 F.3d 253, 256 (3d Cir. 2014) (en banc) ("Failure to give 'meaningful consideration' to any such argument renders a sentence procedurally unreasonable which, when appealed, generally requires a remand for resentencing.")

## VII. BACKGROUND

The sentencing factors set forth in § 3553(a) include:

- the nature and circumstances of the offense and the history and characteristics of the defendant;
- the kinds of sentence available;
- the Guidelines and policy statements issued by the Sentencing Commission, including the advisory guideline range;
- the need to avoid unwarranted sentencing disparity; and
- the need to provide restitution where applicable.

---

[5] Courts previously followed a three-step process, in which the court first calculated the guideline range, then next ruled on motions for departure, before considering the 3553(a) factors. *See United States v. Gunter*, 462 F.3d 237, 247 (3d Cir. 2006). In an extensive amendment to the Guidelines effective November 1, 2025, the Sentencing Commission eliminated the departure provisions in the manual and dictated the two-step process described above.

18 U.S.C. § 3553(a)(1), (a)(3), (a)(5)-(7).

At base, the overarching goal of this two-part process is the imposition of a sentence "sufficient, but not greater than necessary," to achieve the goals of sentencing. *See* 18 U.S.C. § 3553(a); *Kimbrough v. United States*, 552 U.S. 85, 101 (2007).

In arriving at an ultimate sentence, the sentencing Court should not treat a guidelines sentence as inherently superior to, or more reasonable than, a non-guidelines sentence. Indeed, there is no presumption that a within guidelines sentence constitutes a substantively reasonable sentence. *See Nelson v. United States*, 555 U.S. 350, 352 (2009) ("The Guidelines are not only *not mandatory* on sentencing courts; they are not to be *presumed* reasonable.") (emphasis in original); *Gall v. United States*, 552 U.S. 38, 50 (2007) (sentencing courts "may not presume that the Guidelines range is reasonable."). Nor can the Court refuse to consider non-guidelines sentences in ordinary cases. *See Pepper v. United States*, 562 U.S. 476, 496-97 (citing *Gall*, 552 U.S. at 47).

<u>Sentencing Factors Under</u> § 3553(a)

The Court should consider the following factors when determining what type of sentence is sufficient, but not greater than necessary, to satisfy the purposes of sentencing for Mr. Granville:

**a.   The Nature and Circumstances of the Offense and Mr. Granville's History and Characteristics**

As detailed in the PSR, Mr. Granville is a first-time offender who was charged with conduct that is wholly inconsistent with the otherwise unblemished, impeccable law-abiding life. The defense humbly submits that in this case, for this individual, a sentence even within the guideline range suggested by the PSR would still be substantively unreasonable. At the age of forty-six, Mr. Granville is a church going devout man, dedicated nearly two decades of service to his profession in which he excelled, married a wonderful woman, fathered three amazing children, and connected with various communities in Philadelphia to give back to the city he loves. He was forced to resign

the job he loved and has since found it extremely difficult to find meaningful employment despite significant efforts. While these charges have been pending, he has been under the supervision of Pretrial Services and has been fully compliant with all the conditions imposed by the Court. Considering these factors, the factors outlined under 18 U.S.C. § 3553(a), and many other reasons described below, the defense respectfully submits that a sentence of non-incarceration is appropriate in this matter.

**b.      The Need for the Sentence Imposed to Promote Certain Statutory Objectives**

### i.      *To reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense*

For a true first-time offender, for the instant offense, a sentence of non-incarceration below the guidelines range of 51-63 months is a significant punishment. Any greater sentence would be disproportionately harsh for someone charged with this offense and who has no prior criminal record. With regards to fashioning a just punishment, the Court may consider the punishment that Mr. Granville and his family have already suffered during this prosecution – mentally, financially, and emotionally. For Mr. Granville and his family, this prosecution started in June 2022 when law enforcement approached him. Since that time, they have been unable to sleep properly, have struggled financially, and have suffered the embarrassment and stain of the instant criminal charge. Feelings of shame and embarrassment have endured. The Court can consider these consequences as a part of Mr. Granville's punishment and vary downward to account for it. The Court also has the discretion to consider the forty months that Mr. Granville has served on pre-trial supervision, without any violation, and vary downward to account for it.

### ii.      *To afford adequate deterrence to criminal conduct*

A sentence of non-incarceration under the circumstances of this case would also sufficiently serve to deter the general populace. It would also be consistent with the principle of

incremental punishment as there is no need to impose a term of imprisonment on one who has never even served a period of probation. Moreover, with respect to general deterrence, the National Institute of Justice, part of the United States Department of Justice, has acknowledged that it is the *certainty* of punishment, not the *severity* of it, that has the most significant general deterrent effect, and that increasing the severity of punishment does little to deter crime[6].

### iii. To protect the public from further crimes of the defendant

The defense respectfully submits that there is no danger that Mr. Granville poses a risk of future criminal activity. Statistics show that Mr. Granville poses a significantly low risk of recidivism. Indeed, the United States Sentencing Commission has recognized that those individuals with no prior criminal history points represent a lower recidivism risk than others who are in criminal history category I but who have one criminal history point[7]. Mr. Granville requests, therefore, that the Court vary downward to account for his status as someone who truly has no prior contact with the criminal justice system.

If one further divides those with zero criminal history points into the groups who have no prior arrests, those who do have prior arrests but no convictions, and those who have convictions for offenses that are too minor or too old to count towards criminal history points, the recidivism rate (defined as a re-conviction, a re-arrest or a supervision revocation) of the "true" first time offender is only 6.8% over the first two years[8]. To account for this difference between true first-

---

[6.] *See* National Institute of Justice, Office of Justice Programs, U.S. Dept. of Justice, *Five Things about Deterrence* (2014), *available at* https://ncjrs.gov/pdffiles1/nij/247350.pdf (last visited March 4, 2021).

[7] *See* U.S. Sentencing Comm'n, "Recidivism Among Federal Offenders: A Comprehensive Overview," at 18 (2016) *available at* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2016/recidivism_overview.pdf (last visited March 4, 2021).

[8] *See* U.S. Sentencing Comm'n, *Recidivism and the "First Offender": A Component of the Fifteen Year Report on the U.S. Sentencing Commission's Legislative Mandate* at 17 (2004), available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2004/200405_Recidivism_First_Offender.pdf (last visited March 4, 2021).

time offenders and other defendants who are in criminal history category I, the Sentencing Commission previously issued a proposed amendment to the guidelines which would reduce a first-time offender's offense level by one level[9]. While this amendment was not ultimately adopted due to lack of quorum necessary to hold a vote, the underlying research on reduced recidivism rates for true first-time offenders supports a downward variance.

>    ### iv.   *To provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner*

Imprisonment is not needed to provide Mr. Granville with education, training, medical care, or treatment.

### c.   Type of Sentences Available

There is no mandatory minimum sentence in this matter. The Court has the discretion to impose a sentence well below the guidelines range.

### d.   The Need to Avoid Unwarranted Disparities

In light of Mr. Granville's history and characteristics, a sentence well below the guidelines range would not constitute unwarranted disparity. The Court should bear in mind that § 3553(a)(6)'s command to avoid unwarranted disparities carries with it "the need to avoid unwarranted *similarities*." *Gall*, 552 U.S. at 55 (emphasis in original). Where, as here, a defendant's history and circumstances warrant a lower sentence than that imposed on another defendant charged with a similar crime, the difference between the sentences is warranted and just. *See Pepper v. United States*, 562 U.S. 476, 131 S. Ct. 1229, 1252 (2011) (Breyer, J., concurring) ("A just legal system seeks not only to treat different cases differently but also to treat like cases

---

[9] U.S. Sentencing Comm'n, "Proposed Amendments to the Sentencing Guidelines," at 20 (August 25, 2017), *available at* https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/20170824_rf_proposed.pdf (last visited March 4, 2021).

alike. Fairness requires sentencing uniformity as well as efforts to recognize relevant sentencing differences.")

**CONCLUSION**

For reasons set forth above, the defense respectfully requests a sentence well below the properly calculated guidelines range of 50-63 months and suggests that a sentence of non-incarceration would not be unreasonable.

Respectfully submitted,

JAMES A. FUNT, ESQUIRE

DATE: _____ April 15, 2026 _____

**CERTIFICATE OF SERVICE**

I, James A. Funt, Esquire, hereby certify that I have forwarded a true and correct copy of the foregoing *Sentencing Memorandum* to the following:

**Via Email**
**Nancy E. Potts,** AUSA
U.S. Attorney's Office
615 Chestnut Street, Suite 1250
Philadelphia, PA 19106
Nancy.Potts@usdoj.gov

**Everett R. Witherell**, AUSA
U.S. Attorney's Office
615 Chestnut Street, Suite 1250
Philadelphia, PA 19106
Everett.Witherell@usdoj.gov

**Officer Carolyn M. DeMayo**
U.S. Probation Officer, Eastern District of Pennsylvania
William J. Green, Jr. Federal Building
600 Arch Street, Suite 2400
Philadelphia, PA 19106
Carolyn_DeMayo@paep.uscourts.gov

JAMES A. FUNT, ESQUIRE

DATE: _____ April 15, 2026 _____

15

# EXHIBIT A

Re: Ronald Granville

Dear Judge Marston:

I am writing this letter in support of my friend, Ron Granville. I first met Ron in 2019 when my son Franklin was in the same kindergarten class as his son Corey. Ron and I served as homeroom parents together. Ron was very involved with the homeroom activities, from making snack bags to reading stories to leading full class activities. He also volunteered within our larger Home and School Association to run and volunteer at several events which I oversee as a board member. It was evident from the time Corey started at his school that Ron wanted to be present and involved for Corey as well as the other kids at school.

Our sons quickly became best friends. I have seen nothing but absolute love and care from Ron, both for his own children as well as mine. I have also overheard conversations between our sons in which Corey expressed sadness that he couldn't see his big brother. Corey truly sees him as a brother as that is how he has been raised.

Ron is an outstanding father who takes care to provide for and serve as a good role model for all of his sons and the community. He is loving, involved, and teaches compassion and responsibility. I strongly him. Thank you for your time and consideration.


Sincerely yours,


Kathryn Hersh

Good Day,

My name is Marvin Lane (former Correctional Lieutenant of the Philadelphia Department of Prisons). I am writing you on behalf of one of my former Officers and Sergeant Ronald Granville. Ronald Granville was a good Officer and Sergeant working under my supervision at the Philadelphia Department of Prisons. Officer Granville was one of my most honest and dependable staff members at the Detention Center and Curran and Fromhold Correctional Facility (CFCF). Granville was a man of great integrity and very honest. If I needed to lean on staff members to help me with any task during my tenure at the Prisons, Ronald Granville was definitely one of those people.

Outside of the job Ronald was a great guy to be around. He was family oriented and he loved his wife and children. He enjoyed the opportunity to was given to make his family life a great one. When I talked to Ronald he would always mention his wife and children and how his children were doing great and how happy he was with that.

Ronald Granville has been an upstanding citizen, Correctional Employee and friend. Please look at this man and allow him to continue to bring joy and love to his family and friends.

GOD BLESS YOU ALL,

Marvin Lane
(Ret.) Correctional Lieutenant

Natalie Payne
7501 Germantown Avenue
Philadelphia, PA 19119
nepayne@gmail.com
215.385.6166

Dear Mr. Funt:

I have known Mr. Ronald Granville for approximately seven years through my professional capacity at the Philadelphia Department of Prisons. It is through this lens that I offer a character reference letter for him in the hope of providing a more complete picture.

During the time that I have known Mr. Granville, I have experienced someone that was always professional and strived to do the right thing. My staff looked up to him and respected him not because of a higher rank but because of who he is. He is someone that always talked about representing the uniform, representing Philadelphia Department of Prisons, the importance of the correctional officer profession. He was trusted and respected at a high level.

I witnessed Mr. Granville receive disappointment with internal posts and handle them with a level of professionalism that others did not have. Indeed, when I first met him, he applied for a job in my unit, and I had to tell him that he didn't have enough time within the organization. Others had a bad attitude when hearing this message. He was appreciative and thanked me for getting back to him. He was a consummate professional.

I can still hear his words to a class of cadets who chose their class name to be "The Few" and how Mr. Granville reiterated the definition of "few"; a small group of people that do mighty things. He told them that it is the quality that matters.

And that is the person that I know. Someone that wants to do the right thing. That believed in doing the right thing. And valuing integrity.

I appreciate the opportunity to offer my experience with Mr. Granville.

Sincerely,

Natalie Payne
Natalie Payne